May it please the Court, my name is Ann Vojts and I've been appointed to represent Mr. Garcia. I'd like to reserve, if I can, three minutes for rebuttal. I intend to address at argument three sets of issues. The lay opinion issue, the admission of the co-conspirator statements, and vouching. I'm certainly happy to answer any other questions the Court might have. It's my understanding that counsel for Mr. Jasso intends to address the specific unanimity issue. If, however, the Court has questions that are specific to Mr. Garcia on that issue, I'm certainly happy to answer those as well. This Court should reverse, in this case, for all the reasons set forth in the party's briefing, and we join in Mr. Jasso's arguments as well, but in particular for three issues that I'd like to discuss here. First, the Court's decision to allow over-objection, repeated objection, testimony from low-level gang members that was not based on recipient knowledge but based on their training or education was not appropriate, and it was error. It allowed those witnesses to testify unhampered by the limits that apply either to lay witnesses when they're offering opinions or the restrictions on expert witnesses, and that was error. Second, the Court admitted co-conspirator statements at the end of trial that should not have been admitted at all. Even those admitted for a limited purpose were not so limited at trial, and many of them went to a discussion of past events without an appropriate or adequate showing that they were in furtherance of the conspiracy or that for the statements that included layer upon layer of hearsay that the underlying statements were also admissible. Third, I'd like to address the question of vouching. In this case, the government told the jury essentially that they could trust what was being said. They said that in the entire scope of the trial, did any cooperating witness testify to anything? Affirmatively testify to something that was then proved to be untrue? No. And the government backed that up by saying, by making statements that were in fact untrue, by saying that in this case the cooperators don't know the other evidence in the case, they weren't even allowed to review their own reports, and clearly they weren't allowed to review the statements of anybody else. But as the record at trial made clear, that was not true. First, Delgado testified that he only realized he'd been given false grand jury testimony when he was going over his transcripts. He had had those transcripts. And second, all three of the cooperators, Aguilera, Delgado, and Zavala, testified that they discussed the information they shared with the government in building its case. Can we go back to the expert, the first issue?  So why do you think they were testifying as experts when they were members of the gang and were talking about things that they experienced in that capacity? Because what they were talking about was not simply things that they'd experienced, but things that they had no knowledge of. For example, speaking about Mr. Garcia in particular, these witnesses had remarkably little information about him. For example, Mr. Is that an expert issue, or is that just a foundation issue? I think it's both, Your Honor, because they were offering opinions. For example, to give one example of one of the opinions that they gave, they testified about why a kite skipped going to Mr. Garcia's cell, and they offered the opinion that it was because either he'd authorized the action in question or that he knew about it already. That was an opinion. It wasn't based on their personal knowledge. It was based on their experience and their training and education as gang members. And as the Eighth Circuit found in Turner I still have trouble seeing how that is expert testimony as opposed to I've been a gang member. We have rules. We have a constitution. We have other things. Just as examples, and this is how the system works. If it's going to pass by someone at this level, there are only two explanations. Well, I think, Your Honor, Turner is instructive on this. If you look at the way the Eighth Circuit approached it, they said they're not testifying on personal knowledge or perceptions. They aren't a participant in, for example, these conversations. They were interpreting them and providing a gloss on them. That gloss was based on their experience in the gang and their education. They went through training to be gang members. They were basing, as the government repeatedly emphasized, they were basing their opinions on that training. That's precisely what an expert does. And by contrast, this was not a lay opinions witness because it wasn't, this was based on specialized knowledge. And so I think this Court, like Turner, should conclude that this was, in fact, expert testimony. But unlike Turner, should conclude that it was reversible error. In that case, it was deemed harmless. In this case, it was not because the evidence as to Mr. Garcia was very thin. There was no testimony that he, of someone saying that he had ordered them to commit a removal. Much of this was based on assumptions about what his position was. It was also contradicted by other testimony. The cooperator who knew the most about Mr. Garcia, in fact, testified that at various points he'd been frozen out. That there was channel jumping, meaning that people were sort of freelancing and not doing things as part of the gang but doing things separately, which means that some of these actions could also have been part of that. And so in light of that testimony, we think that the error in admitting this was both, it does go, as the Court said, to foundation. It goes to whether this was speculative. But it also goes to whether this was properly admitted. And these were all the grounds on which counsel objected to trial and why the Court should have excluded this testimony but did not. Coming to the vouching issue, my understanding of the record is that it was the defense that brought up the cooperator witnesses' agreements and the requirement, well, just brought up their agreements and that they might have, you know, a benefit in testifying. So with the defense bringing that issue up, why was it improper for the government to respond to that and address the credibility attack? Judge Forrest, I think the answer is the government certainly can respond. The question is how it responds. And the way it chose to respond here was incorrect in two respects. First, it made factually erroneous statements. Second, it didn't sort of say to the jury, take these pieces of evidence and you can draw the conclusion. These are the things, you know, that you can look at to see if it corroborates what has been testified to here or not. What it said was it made an affirmative personal statement. Government counsel said in the entire scope of this trial, did any cooperating witness testify to anything and then answered that question for the jury. That's what a prosecutor cannot do. That crosses the line. So some responses were yes, well, this response was not. I think the 23 seconds I have left of the time I was trying to reserve, if I could briefly address the co-conspirator statements quickly. I think, you know, the court was faced with essentially an avalanche of co-conspirator statements. And while the court did its best, I think, to try and address those, if you go through the order that appears at E.R., the table at E.R. 51 through E.R. 56, time and time again we're talking about past events. But as this Court and others have held, past events aren't necessarily, describing past events isn't necessarily in furtherance of conspiracy. And what the government needed to show and what the court needed to find was that these statements were actually in furtherance. And I see that I'm very short on time, so the court does not have questions on that issue. I'm happy to reserve the balance of my time.  Thank you. Thank you, Your Honor. Good morning. May it please the Court, Mark Flanagan on behalf of Jorge Jasso. Your Honors, and I would like to reserve three minutes, as previously noted. I would like to start with the evidentiary issues. The admission of the unauthenticated and hearsay Champ and Pollo Kites. The admission of evidence regarding the circumstances of Mr. Jasso's arrest, including the District Court's statement in open court that there was a warrant for alleged bank robberies. And the admission of evidence of the fight at North Kern State Prison, which even the District Court recognized was outside the scope of the charged conspiracies. The actual admissible evidence against Mr. Jasso, the most fit player among the individuals charged in the indictment, defendant number 15 of 15, was exceptionally thin. It consisted in its entirety of the testimony of two cooperating co-defendants who were cousins, were inappropriately housed together, and with a third cooperator while preparing to testify, and one of whom demonstrably lied to the grand jury, as well as improperly admitted evidence that I'll go into further. And the jury deliberated for four full days before reaching a verdict, reflecting how close the case was, even with the erroneous admission of the improper evidence. Now, because the government's principal evidence came from the testimony of biased cooperating witnesses, it heavily relied upon evidence that it claimed corroborated their testimony, along with extrinsic, highly prejudicial evidence having nothing to do with the crimes with which Mr. Jasso was charged. Let's start with the so-called Champ and Pollo Kites, handwritten notes that purported to recount the removals that Mr. Jasso was accused of taking part in. They're at ER 3182 and 3183. I think that's correct. Exhibits 309 and 310. Yes, I am. Okay, that's fine. Go ahead. Unfortunately, I don't have the ER version. No, no, that's fine. Go ahead. Yes. They're two-page documents. The declarants for the information in these kites did not testify, and therefore there was no opportunity to cross-examine them as to the basis of their alleged knowledge. And so it is entirely possible that even these non-witness authors didn't actually observe or otherwise have personal knowledge of the Wolfie removal, so it could very well be the product of hearsay upon hearsay upon hearsay. We just don't know. And with respect to the Ernesto Rodriguez removal, there was no corroboration of the cooperator's testimony in a kite or otherwise at all. Now, we acknowledge the admissibility of co-conspirator statements, but only where the requirements of the hearsay exception are established, which they were not here. And the hearsay exception does not exempt the government from authenticating the kites, that is, establishing what they purport to be. The government failed to authenticate the CHAMP kite. The sponsoring witness, Mr. Cota, admitted that he was not the author but claimed it was written by one Alexander Montano, a.k.a. CHAMP. Cota could not identify the handwriting as being CHAMP's, nor did he even recall seeing the kite before preparing for trial. And he could not rely on the name of the alleged author within the kite itself as a guarantor that it was what it purported to be for at least two reasons. First, there was testimony that some kites are so-called Xeroxes, which are manually handwritten copies of an original kite or even a potentially copy of a copy. Because Alexander Montano, CHAMP, did not testify, we have no way of knowing whether he was the true author of the kite that came into evidence or whether it was a Xerox and therefore whether any errors were introduced into it during the recopying. Moreover, if there were Xeroxes, the Xeroxers were unidentified and unidentifiable. And yet, under the Mouzine case, the identity of the declarant is essential to a determination that the declarant is a co-conspirator. Where was this CHAMP kite note found? It was found in a search of a residence, as I recall. Whose residence? Do you know? I don't recall offhand, Your Honor. It was not Mr. Jasso's, I know that. And not Mr. Garcia's either? That I can't say, I'm sorry. I mean, the rule of evidence on this doesn't say you have to authenticate 100%. You have to have sufficient, you know, sufficient to support a finding. So it's true that Mr. Cota didn't write the note, but he gave some indication that these are the kinds of notes we use. He recognized the events that were discussed in the note. He knows who CHAMP is. So why would that not be enough for a jury to conclude that this is an authentic kite? I don't think it's enough, Your Honor. He didn't, he had never seen it before. He didn't recognize the handwriting. It was not information that was uniquely in the possession of Mr. CHAMP, Mr. Montano, a.k.a. CHAMP, which is another way that you can authenticate something if the statement is of something that the person who it's claimed to have written uniquely has that information. The mere fact that it looks like a kite, that the subject matter is something that he was aware of, that doesn't go to, none of those issues go to authentication. The authentication asks the question, did Mr. Montano write this kite? All we have is what's written in the kite itself, which is not enough. You have to authenticate beyond the mere document itself, which is similar under the co-conspirator exception as well. You can't rely only on the intrinsic content of the document that's being authenticated unless it's actually signed and handwriting is recognized by the sponsoring witness, which they couldn't do. Were you going to address the unanimity instruction? Was that something you were supposed to? I was planning on it. Can you go ahead and talk about that? Sure. Let me go to my notes. Your Honor, our position is that the government erred by failing to give a specific unanimity instruction regarding the two Vicar conspiracy counts. Based on Ninth Circuit precedent, a Vicar conspiracy to attempt murder requires unanimity among the jurors as to the underlying conspiracy if there is a potential to find more than one possible conspiracy, and that's the Gonzales and Lapierre cases. Is it your position that here the argument is by the government we have a conspiracy of attempted murder generally, and there are several attempted murders that are listed as examples of that. Do you think each one of those required its own separate instruction in the context of a Vicar case like this? I think specifically with the Vicar conspiracy counts, the district court was obliged, given that there were two potential victims. I'm just kind of wondering what the rule is that you want us to adopt here, and I recognize it's plain error, and that creates some additional questions for your position, but just in terms of the rule you would want, if there's a Vicar conspiracy with multiple murders or attempted murders, you think there needs to be a unanimity instruction just sort of as a matter of law in that context? I do, Your Honor. I think in that particular context, and I think the Lapierre case is instructive there, that Lapierre didn't say in all cases we must do that, but under the facts of Lapierre, which I think follow through, and most circumstances under the hypothetical the court has posed, which is where there are multiple possible victims who are identified in the evidence during the case, whether to ensure that the jury has agreed that the defendant was a part of a conspiracy to remove that particular individual as opposed to six of them think that he was guilty of being part of a conspiracy to murder or remove victim one, and six of them thinking that he was part of the conspiracy to . . . Again, still good law. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. I'm not sure, to be perfectly honest, Your Honor. Going to the evidence, what is the evidence in the record that would suggest that there were separate conspiracies to attack other gang members in the jail? Well, I don't want to suggest . . . I think there's different victims and maybe you have different people involved with the different victims, but what in the evidence tells us that sort of the structure and why they're having these conversations about removing particular people are completely independent from each other? Well, we don't know, and frankly, part of the problem is that the evidence of Mr. Jostle's participation in the conspiracy was very thin. All we really have is that . . . Well, I mean, the government presented evidence that sort of the structure of how these removals were happening was a gang-wide practice. So there's some evidence that it's an overall practice, not that it's individualized to particular victims. So that's some evidence in the record. What else is there to suggest that the opposite is true, which needs to be there for your argument to work? Well, I think that the . . . I mean, the reason why I don't think the government's position works is that the government's position regarding Mr. Jostle's conspiracy appears to be that there was an agreement to kill or assault members who in the future violated NF rules. Our position is that does not, as a matter of law, work for the two Vicar conspiracies because they require a specific intent to kill or assault a specific individual. And under a government stated theory, the hypothetically intended victims in this overall overarching you shall remove someone if you're asked to, those victims do not yet even exist at the time of this alleged agreement because they haven't yet broken any rules. That's why the government was obliged to prove under the two Vicar accounts that Mr. Jostle was part of a specific conspiracy to remove either Wolfie or Ernesto Rodriguez. It's not enough for them to say under the Vicar rules, and it's why we challenge under Vicar not to count one RICO conspiracy, but under Vicar because you have to have a specific intent to harm or assault a specific individual, you can't . . . the government cannot rely on some overarching conspiracy that if in the future you're ever asked to assault or kill somebody, you shall do it. That's not good enough because you don't have the specific intent at that time, at the time of that hypothetical agreement, to kill or assault a specific individual. That's why the government's theory just doesn't work with respect to the Vicar conspiracies sort of full stop, and that's why as well the court was obliged to or should have instructed the jury that you need to be unanimous as to which conspiracy Mr. Jostle was . . . what was the object of the conspiracy that he was a part of? Was it with respect to Wolfie? Was it with respect to Ernesto Rodriguez or both? But we can't have a situation, and this was the fear that the Gonzales District Court actually addressed by requiring unanimity as to the intended victims. All right, Counsel, you're over your ten minutes, but we'll give you some time on rebuttal. Thank you very much, Your Honor. Good morning. May it please the Court, Annie Schafer, United States. This Court should affirm the convictions and sentences in these cases for three reasons. First, Mr. Garcia and Mr. Jasso were charged and convicted of three conspiracy counts that rested on the same underlying factual basis, and these facts, as proven at trial, showed a single overarching conspiracy, which was to conduct and participate in the affairs of the Nuestra Familia racketeering enterprise. As part of that enterprise, those defendants agreed to murder and assault in aid of racketeering by removing fellow gang members who violated NF rules. Mr. Garcia was a leader in this enterprise with the authority to direct these removals, and Jasso was a foot soldier who participated in several other removals. These same facts and crimes that were charged in the indictment were proven at trial, and so there was no constructive amendment or fatal variance in this case. Furthermore, because there was no evidence of multiple unrelated conspiracies, the District Court did not plainly err in not to respond to issuing a specific unanimity instruction. Second, the District Court did not plainly err in its evidentiary rulings in this case. These cooperators did not testify as unnoticed experts, but as precipient witnesses describing their personal experiences growing up and being members of Nuestra Familia and the Nortenios gangs in the Salinas area. The kites and the other statements that are challenged by the appellants were properly admitted as co-conspirator statements because they were made in furtherance of this enterprise and its purposes. Can you address the authentication of the CHAMP kite? Yes, Your Honor. With regard to the CHAMP kite, that came during the cooperator CODIS testimony, and the witness there testified that he knew CHAMP as the son of Mr. Garcia's girlfriend. He was able to identify the CHAMP as Alexander Montano and how he knew him. He also discussed, essentially, that he provided testimony about his knowledge of kites in general and why he recognized this. I will also say that he provided much testimony about both of the... Did he recognize it? I mean, he hadn't seen it before, right? Yes, he did, Your Honor. So he did testify as far as with the roving removal when it occurred. The first time he said he had heard some shuffling, he saw it happen, and he was suspicious about it. And so he actually ordered, he was in jail at the time, and ordered Magdaleno and others to submit incident reports about what happened because he was suspicious. He received those incident reports, and he actually called Mr. Garcia about it shortly thereafter. Then he left jail. When he came back, he said there were two other members that had come out, and there was a lot of, essentially, accusations that what Magdaleno and Cervantes did with the roving removal were wrong. And so those kites were written during that time, and he said... They were wrong in that they were unauthorized? Why were they wrong? There was, according to Cota's testimony, he stated that he was not sure if the removal of Wolfie was actually something that was authorized by the Carnale or if Magdaleno had essentially authorized it himself. But Magdaleno had said that it was essential at the time to remove Wolfie because he was there on a rape charge. The kites that... Some of the kites that Cota had received and tried to verify this contradicted that. And so he did provide sufficient testimony about how he and why he recognized those kites based off of their substance. And under this court's law, that is enough to meet that minimal standard for authentication. He testified about format, too, not just substance, right? Yes, Your Honor. Yes, Your Honor, he did. He testified to certainly some length about how he signed, how he started with certain greetings, and what these kites were used for, and what they were written on, and so forth. So he certainly had more than sufficient knowledge of kites and provided sufficient testimony to show that these were what he claimed them to be. What about the co-conspirator statements that seem to be about just past events? And I'm thinking mostly of Zavala's testimony regarding the Gonzalez removal and then Aguilera's testimony about that same topic. It seems like that subject matter is just something in the past that happened. How is that in furtherance of the conspiracy going forward? Well, Your Honor, I think that with a lot of these co-conspirator statements, I think what matters here is what the evidence shows that this gang was about and how it operated. And I think with both the kites and a lot of these statements that— I get that's the government's reason for introducing it into the record, but in order to get out of the hearsay bar for a co-conspirator statement, you have to show that the evidence coming in was in furtherance of the conspiracy in terms of, like, the speaker, and that was their purpose. And I'm not quite sure how you meet that for statements that are just purely stuff that has happened in the past that don't relate, unlike some of the other pieces of evidence, don't relate to a concern the speaker had about being disciplined for something or other things related to ongoing activity. Well, Your Honor, these sort of communications that were a hearsay were indeed statements that were made in furtherance of conspiracy to keep order and discipline in this gang. I mean, this is how the gang operated, right? They communicated with each other through sign language or kites or just talking to each other about incidents that occurred about— there was a whole—there was a due process mechanism by which gang activities were reported and investigated. Again— Let me make sure I understand you. So the argument is that by talking about a past removal or attempted removal, that it's in furtherance of the conspiracy because it's sort of furthering the message, you better stay in line, you better follow the rules, or this will happen to you. Yes, Your Honor. If that's your theory, then how is it that— I mean, wouldn't essentially everything that they talk about related to the gang would be in furtherance of the conspiracy in your mind? With the facts in this case, yes. Most things, if it has that purpose of essentially keeping order and discipline in the gang. Now, I think this Court's case in Leighton strongly supports this. I think the line is drawn where in Eubanks you had a— you had the defendant speaking to his wife about something that happened, and this Court in Eubanks found that there was no essentially enterprise or conspiracy purpose there. However, Sears was another case in which this Court found that— I think there was a woman and her husband who were harboring the defendants or essentially co-conspirators who made statements with essentially the intent to dissuade them from calling the police. Counsel, for what you're talking about right now, was there any objection made that there was in addition to the hearsay problem that there was a 403-404 problem that the probative value was significantly outweighed by the prejudice? Your Honor, I think the judge in this case was very careful about her 403 analysis and I think did keep out a significant amount of the statements, and I think you see this in the pretrial proceedings. But on this one, was that objection made as well? With which specific statements, Your Honor? What you're just answering the question about, about past incidents admitted for the purpose that it was in furtherance because it's showing we need to keep people in line, this is the way things worked. On those, was there ever an objection made that the particular subject matter was so prejudicial it should be kept out because that outweighed its probative value? I think there were some general objections to the subject matter, Your Honor. I don't remember if there were specific objections to these specific statements. However, with regard to... So that's always a guardrail, right? Absolutely, Your Honor, and it was a guardrail that was used in this case by the district court. I would say that as far as a probative value, those sort of statements showing, again, both the truth of the matter, a lot of the statements pertain to past remittals that were part of the charge conduct, but also they helped to show the enterprise and how this enterprise operated, that this was a very militaristic gang that operated off very strict rules and imposed rather severe forms of discipline when it came to violating those rules and kept that order disciplined by instilling fear throughout its ranks. And part of that was essentially the communications that were spread throughout that enterprise. Can we shift gears a little bit? And I have a question for you about the Brady issue. Why did the government concede to the district court that the information about the false grudge retestimony should have been provided to defense counsel pretrial? And I guess sort of a companion question to that is, should we consider the fact that the government made that statement in assessing the issue? Your Honor, I think the government's concession here was essentially that yes, there was a late disclosure in the sense that as soon as that statement was made, and again, we're talking about the second statement, which was when during witness prep, Mr. Delgado and the government realized or said something along the lines that he had misspoke during his grand jury interview. The government, I think during the litigation later, said that in hindsight at the time, it should have made a note of that statement and provided it to defense. And I think that's a fair characterization. I think it doesn't ultimately affect the Brady issue because the three elements, you know, materiality still has to be met, and there was no prejudice here by that late disclosure. I think as the record clearly shows. So I don't, for your question, Your Honor, whether it should have any impact for this court's ruling, I don't think it does on that Brady issue. Can you turn to the unanimity instruction? I mean, I guess the question I have here, there is a plain error overlay to this, but just in terms of what the law is, can you just give a case where you have an attempted murder as the object of the conspiracy and you have multiple attempted murders, are there ever situations in which a more specific instruction is going to be required, or is it always going to be sufficient what we have here? Well, I think what's important in this particular case is that the overarching conspiracy of the charger is Rigo conspiracy. And Rigo conspiracy, as the Supreme Court has made very clear, does not require overt acts as an element. Beneath that, you have Counts 2 and 3, and I think that's what the specific unanimity instruction is challenged, is based on, and those are the Vicar conspiracies. And so those Vicar conspiracies are based, again, on the same facts, which is essentially the removals that occurred as part of these enterprise activities. And there's not an issue under this Court's law. I would say that there are a few cases, United States v. Bibbro, which is 749F2D581, and essentially if there's no evidence of multiple, meaning unrelated and separate conspiracies, there's really no issue here. There's no risk of confusion that the jury might convict on multiple or different conspiracies. Does it just depend on the evidence? Because here someone could say, well, these removals were disconnected, had nothing to do with each other. Your position is that's not true. They were all part of a common scheme and plan to remove members of the gang who had acted out of line. But does it just depend on every case on what the evidence shows, or are there any kind of legal rules that undergird this? Well, it absolutely depends on the evidence in any certain case, but I think the legal rules, I think, Judge Bennett, what you were mentioning earlier with the Braverman case, it is certainly still a law that essentially you can just, you can have a single overarching conspiracy. Yeah, I mean, but to go to Judge Bress's question, I mean, it can't be one size fits all. You have to look at what the evidence is, what the claims are. Is there something under which a reasonable jury could find that there were actually multiple conspiracies here? And, I mean, then you might get to a question on appeal about harmless error, but it would have to depend on what the evidence is, right? It can't be one size fits all. Absolutely, absolutely, Your Honor. And I think that's why in this case the evidence clearly showed one overarching conspiracy. And, again, it was part of this gang's operation to enforce its own rules through these violent removals. And, therefore, within this overarching conspiracy were essentially sub-conspiracies, right, or these sub-agreements to commit the Vicar murder and commit the Vicar assaults. With respect to Defendant Jasso, if you take out for the moment the champ kite, what other evidence, what is the evidence supporting his convictions here? Well, Your Honor, there were all the co-conspirators, or four co-conspirators, who discussed Jasso's involvement. Three of them were actually in the same KPOD area as Jasso was, saw him on a daily basis, saw him at trainings. Jasso actually, I think he did intake for, I believe it was Aguilera, and he was a squad leader for Delgado. And so they testified to their daily experiences about Jasso's involvement in both removals and the conspiracy. How about the specific two removals, I think it's two, that was setting aside the North Kern State Prison one, but the two removals that he was allegedly involved in? Yes, Your Honor. And so both Delgado and Aguilera testified, as did, actually as did Zavala, about those removals and witnessing essentially Jasso's involvement in them. If there are no further questions, the government respectfully requests that this court affirm. Thank you. Thank you. Thank you, Your Honors. I'd like to address three points, if I may. First, I think there's a really interesting admission that the government made when they admitted that the Wolf ear removal was about freelancing, that Magdaleno did something because he thought it was essential. And as the testimony at trial established, people could act independently in those circumstances. And there was testimony, in fact, from Mr. Cota, among others, that there was freelancing, that people were doing what they wanted. And so that, I think, goes to the point that why there needed to be a specific unanimity instruction, because the test is not whether the government has no evidence of a single conspiracy. The test is, is there a reasonable possibility that a jury could find multiple conspiracies? And here, where there was evidence that not everybody was on the same page, that people were freelancing, I think it was appropriate to give one here. I'd also like to note, in response to the Court's point earlier, that when it came to counts two and three, neither, as the district court noted with some puzzlement, actually named any specific victims. And so a specific unanimity instruction was important so that each juror wasn't sort of choosing their own adventure, because that goes beyond the bounds of constitutional limits. Second, the government says, once again, that Mr. Garcia was the leader. But I'd encourage the Court to look at the evidence that actually supports that. And if it looks at, for example, some of the sites in the government's brief, as we explained in our reply, they're attributing to Mr. Garcia testimony that was about general practices, but that was not specifically attributed to him. The three co-conspirators who, or the three cooperators who did talk about these things, for example, one had a single conversation with Mr. Garcia. Another had never had an interaction with him or had never spoken with him. And one had two conversations, one of which had occurred many years earlier. So, again, when the question is, when you look at what these assumptions are based on and what the permissible evidence is, we'd submit that that calls for reversal here. And then, finally, I'd like to make one point about the Brady issue, because I think it ties in with the same issue as the voucher. The government said, well, there was a late disclosure. I'd like to correct that. There was actually no disclosure by the government. This was raised by defense counsel. And the government's response was, well, we didn't do anything with it. When we realized the problem, we didn't do anything with it. And in their view, that was a defense. It was not. That's actually not what the government is supposed to do. The government is supposed to disclose it to the defense so the defense has an opportunity to address it. It ultimately came out. But, again, that sort of underscores the fundamental problems with this case. If there are no questions, I'd submit. Thank you very much. Counsel, we'll give you two minutes. With your permission, I'd like to return to the evidentiary issues briefly at least. And I'll note that as I was listening to the government counsel argue, I found it telling that when asked what was the evidence against Mr. Jasso, there was no mention even of the North Kern State prison fight, nor of the evidence that came in, albeit stricken one week later, about the circumstances of his arrest on flight with guns and gang tattoos and so forth. What they really had was the kites plus the testimony of the impeached co-conspirators. With respect to, and I'll try to be brief, apart from the authentication issue, as the court is aware, our position is that the government failed to show that Pollo or Champ were members of a conspiracy with Mr. Jasso as required under the law and that these statements were in furtherance of the conspiracy. As I believe Judge Forrest was inquiring about, I think it's absolutely the case that these were just narrations of past events. On appeal, the government claims that the kites furthered the conspiracy because the evidence demonstrated how NF kept its members adherent to its strictures through the threat and use of violence as occurred with Wolfie. That's talking about the substance of the kites. The underlying facts within the kites may show, may further a conspiracy, but that doesn't show how the kite furthered the conspiracy, which is what the government had to show. Not that the underlying sort of policy reflected in the kite furthers the conspiracy, but how the kite itself furthered the conspiracy, and that they failed to show. With respect to, and I will note and cite in our briefs, that the declarant's out-of-court statement standing alone is insufficient to establish that the defendant and the declarant had knowledge of and participated in a common conspiracy. And, of course, mere gang membership does not equal conspiracy. I'd like to turn to the evidence around the circumstances of the arrest. You're out of time. I want you to do it very quickly. Okay. I'll just note then, without elaboration, that additional extremely prejudicial evidence came in through the circumstances surrounding his arrest upon flight, which the district court struck, but one week later, and it's just a bell that can't be unrung. And then secondly, the North Kern State prison fight, which only went in, frankly, to show propensity to violence. It was not tied in to being part of a removal or anything like that. It was very vague. There was a fighting in the prison. It's outside the scope of the conspiracy, and it's not proper for it to be evidence either. With that, I'll submit. All right. We thank all counsel for their arguments, and the case just argued is submitted. And with that, we are adjourned for the day.
judges: BENNETT, BRESS, FORREST